## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FLORIDA BANKERS ASSOCIATION**<br>**1001 Thomasville Road, Suite 201**<br>**Tallahassee, FL 32303**<br><br>**and**<br><br>**TEXAS BANKERS ASSOCIATION**<br>**203 W. 10th Street**<br>**Austin, TX 78701**<br><br>      **Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES DEPARTMENT OF**<br>**TREASURY**<br>**1500 Pennsylvania Avenue, N.W.**<br>**Washington, D.C. 20503**<br><br>**JACK LEW, in his official capacity as**<br>**Secretary of the Treasury**<br>**1500 Pennsylvania Avenue, N.W.**<br>**Washington, D.C. 20503**<br><br>**INTERNAL REVENUE SERVICE**<br>**1111 Constitution Avenue, N.W.**<br>**Washington, D.C. 20224**<br><br>**STEVEN T. MILLER, in his official capacity**<br>**as Acting Commissioner of Internal Revenue**<br>**1111 Constitution Avenue, N.W.**<br>**Washington, D.C. 20224**<br><br>      **Defendants.** | **CASE NUMBER:**<br><br>_____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Pursuant to Federal Rule of Civil Procedure 65, the Declaratory Judgment Act, the

Administrative Procedures Act ("APA"), and the Regulatory Flexibility Act (the "RFA"),

Plaintiffs Florida Bankers Association and Texas Bankers Association (collectively, the

1

"Bankers Associations") file this Complaint against Defendants United States Department of Treasury ("Treasury"); Jack Lew, in his official capacity as Secretary of the Treasury; the Internal Revenue Service ("IRS"); and Steven T. Miller, in his official capacity as Acting Commissioner of Internal Revenue; seeking a declaratory judgment finding that the amendments to 26 C.F.R. §§ 1.6049-4(b)(5) and 1.6049-8 were promulgated in violation of the APA and RFA and an order staying the enforcement date of the amendments.   In support of their request for relief, the Bankers Associations show the Court as follows:

## INTRODUCTION

This is a lawsuit under the Declaratory Judgment Act, the APA, and the RFA challenging the rule amendments (the "Amendments") finalized by the IRS and Treasury on April 12, 2012. 77 Fed. Reg. 23391 (April 19, 2012) and 26 C.F.R. §§ 1.6049-4(b)(5) and 1.6049-8.   The Amendments require U.S. commercial banks, savings associations, and other depository institutions, as well as the U.S. branches of foreign banks, that hold accounts from non-resident alien individuals to file a report (Form 1042-S) with the IRS identifying the name, address, amount earned, and other personal information regarding any individual non-resident alien depositor whose account earns ten dollars or more of interest per year.   26 C.F.R. §§ 1.6049-4(b)(5) and 1.6049-8; 77 Fed. Reg. 23394.   This information is being collected for the express purpose of sharing such information with seventy-two countries with which the United States has an income tax or other convention or bilateral agreement relating to the exchange of tax information.   Interest paid to nonresident aliens on U.S. bank deposits is not subject to federal taxation in the United States. 26 U.S.C. § 871(i)(2)(A).   Prior to the Amendments, only interest paid to nonresident Canadians was subject to the interest reporting and inter-country sharing. 26

C.F.R. §1.6049-4 (effective January 1, 1997); see also 61 Fed. Reg. 17574 (Apr. 22, 1996) as amended 62 Fed. Reg. 53491 (Oct. 14, 1997).

The Defendants now seek to justify this vast expansion of the reporting, collection, and international sharing procedures on the basis that such reporting requirements are "essential" to "ensure that the IRS is in a position to exchange such information reciprocally with a treaty party when it is appropriate to do so." 77 C.F.R 23391.   Defendants also seek to justify the Amendments on the claim that there is "a growing global consensus regarding the importance of cooperative information exchange for tax purposes." 76 C.F.R. 1106 (Jan, 7, 2011).   Within the potential scope of this arrangement are seventy-two countries with which the United States has an income tax or other convention or bilateral agreement relating to the exchange of tax information through which the United States agrees to provide and receive individual financial information.   Rev. Proc. 2012-24.   These countries include, for example, Egypt, Mexico, Pakistan, the Russian Federation, and Venezuela.   Security concerns over the potential leakage and abuse of personal asset information from this sweeping international exchange with many countries that have unstable governments and porous law enforcement systems has led many non-resident aliens to withdraw or transfer money held in interest bearing bank accounts in the United States.

This outflow of deposits and other investments has reduced and will in the future reduce the ability of U.S. depository institutions to make income-producing loans and to create jobs and spur economic growth in their local communities. Moreover, depository institutions in the United States are highly regulated and are already subject to extensive and often-used procedures for federal and state governmental authorities through which these governmental authorities may submit individual requests to obtain and utilize information relating to bank accounts maintained

at branches in the United States.  <u>See</u> <u>e.g.</u> 12 USC § 3405.  The IRS can also review bank documents informally under 26 U.S.C. § 7602(a)(1).  Thus, the reporting requirements set forth in the Amendments are redundant, cumulative, and unnecessary.  Furthermore, requiring banks in the United States to report such information for all non-resident aliens holding interest bearing accounts imposes a substantial economic hardship on such banks, which must develop and implement ongoing procedures for gathering and reporting such information.

In adopting the Amendments, Defendants have effectively reversed ten years of governmental policy during which a proposed expansion of the Canadian reporting and exchange model had been considered but rejected.  Nowhere has there been any factual representation explaining why the prior analysis is no longer justified.

Despite the significant economic impact of the regulations on banks in the United States, Defendants have taken the position that the sweeping Amendments do not constitute a "significant regulatory action" and are not subject to the APA.  Defendants have further taken the position that the Amendments are "not expected to have a significant economic impact on a substantial number of small entities" and, therefore, not subject to the RFA.  In other words, in promulgating these Amendments, Defendants have claimed exemption from all of the procedural safeguards put into place by the APA, the RFA, and related Executive Orders which were put into place to ensure that regulations are not overly burdensome or harmful to small businesses and other affected parties.

Contrary to the Defendants' contentions, both the APA and RFA are applicable to Defendants' promulgation of the Amendments.  Because Defendants failed to comply with the APA and RFA in promulgating the Amendments, the Bankers Associations seek a declaratory judgment holding that the Amendments were promulgated in violation of the APA and the RFA

4

and are therefore invalid and otherwise unenforceable.   The Bankers Associations further respectfully request that the Court enter an Order staying the effective date of the Amendments.

## **PARTIES, JURISDICTION, and VENUE**

1.     Plaintiff Florida Bankers Association ("FBA") is a nonprofit association representing the interests of small and large commercial banks and savings institutions headquartered or doing business in the State of Florida.  The FBA's membership includes "small businesses" as that term is defined in 5 U.S.C. § 601 and 15 U.S.C. §632.  FBA's member depository institutions are subject to the information collection and reporting requirements and resulting economic impact of the Amendments.

2.     Plaintiff Texas Bankers Association ("TBA") is a nonprofit association representing the interests of small and large commercial banks and savings institutions headquartered or doing business in the State of Texas.  TBA's membership includes "small businesses" as that term is defined in 5 U.S.C. § 601 and 15 U.S.C. §632.  TBA's member depository institutions are subject to the information collection and reporting requirements and resulting economic impact of the Amendments.

3.     The Bankers Associations have standing to initiate the Complaint on behalf of their member depository institutions that are subject to the Amendments and will be directly affected by the Amendments.   As such, they would have standing to sue individually or collectively in their own right.  See National Treasury Employees Union v. United States Merit Systems Protection Bd., 743 F.2d 895, 910 (D.C. Cir. 1984) ("Trade associations have also been allowed to sue on behalf of their injured members under the APA's standing section, 5 U.S.C. § 702") (citing National Automatic Laundry & Cleaning Council v. Shultz, 443 F.2d 689 (D.C. Cir. 1971) (holding that trade association has standing to seek judicial review of agency's

interpretative action to vindicate the rights of its members)).  The participation of an individual member is not necessary to either the claims asserted or the relief requested and could further subject an individual member to adverse consequences stemming from the disclosure of confidential financial information.

4.       Defendant Treasury is an executive department of the United States of America. Treasury qualifies as an "agency" as that term is defined by 5 U.S.C. § 701(b)(1).  Pursuant to Fed. R. Civ. P. 4(i)(1)(A)(ii), Defendant Treasury may be served with process by certified mail, addressed to the civil process clerk at the United States Attorney's office, located at 555 Fourth Street, N.W., Washington, D.C. 20530.   In accordance with Fed. R. Civ. P. 4(i)(1)(B), the Bankers Associations will also serve a copy of this Complaint on the Attorney General of the United States and Treasury by certified mail.

5.       Defendant Jack Lew is the Secretary of the Treasury.  Defendant Lew is the individual charged with enforcement of the rules and regulations promulgated by Treasury.  The claims being asserted against Lew by the Bankers Associations are asserted against him in his official capacity as Secretary of the Treasury.  Pursuant to Fed. R. Civ. P. 4(i)(2), Defendant Lew may be served with process by certified mail, addressed to the civil process clerk at the United States Attorney's office, located at 555 Fourth Street, N.W., Washington, D.C. 20530.   In accordance with Fed. R. Civ. P. 4(i)(2), the Bankers Associations will also serve a copy of this Complaint on the Attorney General of the United States and Defendant Lew by certified mail.

6.       Defendant IRS "is a bureau of the Department of Treasury under the immediate direction of the Commissioner of Internal Revenue."  26 C.F.R. § 601.101(a); <u>see also</u> 26 U.S.C. § 7803(a)(Commissioner of Internal Revenue is part of Treasury Department with duties and powers assigned by the Treasury Secretary).   Pursuant to Fed. R. Civ. P. 4(i)(1)(A)(ii),

Defendant IRS may be served with process by certified mail, addressed to the civil process clerk at the United States Attorney's office, located at 555 Fourth Street, N.W., Washington, D.C. 20530.  In accordance with Fed. R. Civ. P. 4(i)(1)(B), the Bankers Associations will also serve a copy of this Complaint on the Attorney General of the United States and IRS by certified mail.

7.      Defendant Steven T. Miller is the Acting Commissioner of Internal Revenue. Defendant Miller is the individual charged with enforcement of the rules and regulations promulgated by Treasury.  The claims being asserted against Miller by the Bankers Associations are asserted against him in his official capacity as Acting Commissioner of Internal Revenue. Pursuant to Fed. R. Civ. P. 4(i)(2), Defendant Miller may be served with process by certified mail, addressed to the civil process clerk at the United States Attorney's office, located at 555 Fourth Street, N.W., Washington, D.C. 20530.  In accordance with Fed. R. Civ. P. 4(i)(2), the Bankers Associations will also serve a copy of this Complaint on the Attorney General of the United States and Defendant Miller by certified mail.

8.      The Court has personal jurisdiction over all Defendants.

9.      This Court therefore has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1331 and 5 U.S.C. § 611(a)(2).

10.     Venue is proper in this court under 28 U.S.C. § 1391.

### FACTUAL BACKGROUND

11.     Based on publicly available government data, there is an estimated $400 billion dollars of individual non-resident alien deposits held by individuals in the U. S. banking system, including deposits held at securities brokerages.  See U.S. Dept. of Commerce: U.S. International Transactions: Fourth Quarter and Year 2012 (BEA PR 13-09, March 14, 2013, Chart 11a, Line

21; see also Treasury International Capital Reporting System: Total Liabilities to Foreigners by Type and Country.

12.     Interest paid to non-resident aliens on U.S. bank deposits is not subject to federal taxation in the United States. 26 U.S.C. § 871(i)(2)(A).

13.     Prior to the promulgation of the Amendments, Banks were not required to report interest paid to non-resident aliens to the IRS unless the depositor is a Canadian citizen.  26 C.F.R. §1.6049-4 (effective January 1, 1997); see also 61 Fed. Reg. 17574 (Apr. 22, 1996) as amended 62 Fed. Reg. 53491 (Oct. 14, 1997). In that instance, the bank must disclose the amount of interest paid and other related information to the IRS on Form 1042-S.

14.     On January, 2001, the IRS and Treasury proposed expanding the information reporting and international sharing of deposit interest information applicable to nonresident alien Canadians to residents of all other countries ("the 2001 Proposal").   66 Fed. Reg. 3925 (Jan. 17, 2001), corrected at 66 Fed. Reg. 15820 (Mar. 21, 2001) and 66 Fed. Reg. 16019 (Mar, 22, 2001).

15.     Due to strong opposition from the financial industry and Congress, the IRS and Treasury withdrew the proposed regulation in August 2002 and re-proposed a narrower regulation applicable to fifteen additional countries ("the 2002 Proposal").   67 Fed. Reg. 50386 (Aug. 2, 2002). In withdrawing that proposal, the IRS and Treasury termed it "overly broad" and noted that:

> After consideration of the comments received, the IRS and Treasury have concluded that the 2001 proposed regulations were overly broad in requiring annual information reporting with respect to U.S. bank deposit interest paid to any nonresident alien.  The IRS and Treasury have decided instead that reporting should be required only for nonresident alien individuals that are residents of certain designated countries.  The IRS and Treasury believe that limiting reporting to residents of these countries will facilitate the goals of improving compliance with U.S. tax laws and permitting appropriate information exchange without imposing an undue administrative burden on U.S. banks.  Accordingly, the 2002 proposed regulations would modify the current regulations (which require

reporting of U.S. bank deposit interest only if paid to Canadian residents) by requiring in addition reporting of U.S. bank deposit interest paid to residents of Australia, Denmark, Finland, France, Germany, Greece, Ireland, Italy, the Netherlands, New Zealand, Norway, Portugal, Spain, Sweden, and the United Kingdom. 67 Fed. Reg. 50387 (Aug. 2, 2002).

16.     For a period of almost nine years, the 2002 Proposal remained dormant and was neither finalized nor withdrawn.

17.     On January 7, 2011, the IRS and Treasury resurrected the concept of a vastly expanded information reporting and international sharing of deposit interest information by formally withdrawing the 2002 proposal and providing a new proposal to make the Canadian model applicable to non-resident alien depositors from all countries with which the United States has a Tax Treaty ("Proposed Rulemaking" or "2011 Proposal").  76 Fed. Reg. 1105 (Jan. 7, 2011).

18.     The IRS and Treasury asserted without any factual support that the Proposed Rulemaking was not subject to the APA. See 76 Fed. Reg. at 1106.

19.     The IRS and Treasury also asserted that the Proposed Rulemaking was exempt from Executive Order 12866 and therefore not subject to a "regulatory assessment" under the RFA. See 76 Fed. Reg. at 1106.

20.     The published notice of Proposed Rulemaking provided no factual basis for Defendants' conclusory statement that the Proposed Rulemaking was not "a significant regulatory action" and not expected to have "a significant economic impact on a substantial number of small entities."  76 Fed. Reg. at 1106.

21.     The published notice of Proposed Rulemaking did not contain an initial regulatory flexibility analysis.

22.     For purposes of the Proposed Rulemaking, a "small entity" was defined as a depository institution with "$175 million or less in assets." 76 Fed. Reg. 1107 (Jan. 7, 2011).

23.     There are approximately 7,200 FDIC-insured banks and savings institutions in the United States, of which 3,609 (50 percent) have assets under $175 million and would therefore be considered "small entities" under the Amendments for purposes of the RFA. Defendants have made no attempt to determine the approximate number of small entities that would be required to report in accordance with these Amendments.

24.     There were ninety-three public comments submitted in response to the 2011 Proposal, only three of which supported the Amendments.  The San Antonio Hispanic Chamber, among many others, specifically warned that the Amendments "would place some foreign investors in a dangerous situation."  Comment on Fed. Reg. Docket Number 2011-00082 at IRS-2011-0001-0053.   This admonition was rejected by Defendants.

25.     In its Comment Letter, the Conference of State Bank Supervisors ("CSBS"), consisting of the state banking regulators from all fifty states and the District of Columbia, specifically requested that "the IRS, in consultation with relevant state and federal banking regulators, perform an analysis of the expected reduction in deposits held in U.S. banks as a result of implementing this rule, including worst-case, expected-case and best-case scenarios" in terms of potential withdrawals and "adverse impacts" on local banking sectors and local economies across the country. Comment on Fed. Reg. Docket Number 2011-00082 at IRS-2011-0001-0062.  This study request was rejected by Defendants.

26.     A public hearing on the 2011 Proposal was held on May 18, 2011.  The testimony elicited at the hearing was likewise overwhelmingly critical of the 2011 Proposal.  The testimony was likewise ignored by Defendants.

27.     At the hearing, Mr. Stephen Ettin, the President and Executive Director of the Institute for Research on the Economics of Taxation entered specific testimony into the record stating that the 2011 Proposal could exceed his prior analysis of the 2002 Proposal, which had concluded that the proposal could shave "as much as perhaps 0.8 of a percent from annual output and income." Comment on Fed. Reg. Docket Number 2011-00082 at IRS-2011-0001-0089.  No rebuttal of this economic analysis has been provided by the Defendants.

28.     On April 12, 2012, the Amendments were approved substantially as proposed and the final Amendments were published at 77 Fed. Reg. 2339-23395.  The final rule did not contain a final regulatory flexibility analysis or any new factual support.

29.     On May 14, 2012, the IRS released a list of seventy-two countries which the Treasury and IRS have determined are appropriate to have an automatic exchange relationship with respect to the information collected under the Amendments.   Rev. Proc. 2012-24, 2012-20 I.R.B. (May 14, 2012).   These countries include, among others, Egypt, Mexico, Pakistan, the Russian Federation and Venezuela.[1]  The Amendments create a system of information collection, storage, and exchange through which the United States would share sensitive individual financial information with seventy-two countries, many of which have unstable governmental and law enforcement systems.

30.     In adopting the Amendments, Defendants characterized them as not constituting a "significant regulatory action" as defined in Executive Order 12866, as supplemented by Executive Order 13563. Under Executive Order 12866, as supplemented by Executive Order 13563, a significant regulatory action means any regulatory action that is likely to result in a rule

---

[1] On September 11, 2012, the Treasury subsequently indicated in a non-binding letter to Rep. Debbie Wasserman-Schultz (D-FL) that it would not exchange information collected pursuant to the Rule with Venezuela.

that may have "an annual effect on the economy of $100 million or more." See Executive Order. 12866 (signed October 4, 1993) at § 3(f)(1).

31.     In adopting the Amendments, Defendants continued to characterize them as not subject to Section 553(b) of the APA.

32.     Defendants further concluded that the Amendments were "not expected to have a significant economic impact on a substantial number of small entities" and therefore not subject to the RFA.

33.     The Amendments do not contain any facts, discussion, or evidence supporting Defendants' conclusions that the Amendments are not subject to the RFA or APA.  Moreover, the administrative record reflects the complete absence of any of the core ingredients a reasoned agency action of this type, such as an examination of current bank deposit information collection capabilities; the benefits, if any, of collecting and exchanging with Canada over a period of years; the basis, if any, for using Canada as a comparison for the unstable and insecure conditions in many of the additional countries covered by the Amendments; and, most importantly, the administrative record contains no evidence supporting the implementation of the Amendments other than conclusory, unexplained, and unsupported statements that "these regulations should not significantly impact the investment and savings decisions of the vast majority of nonresidents."  See 77 Fed. Reg. 23393 (April 19, 2012).

34.     As such, the Defendants arbitrarily and capriciously failed to properly assess the Amendments' costs and economic impact from the standpoint of deposit outflow from the United States.

35.     In evaluating the economic impact of the Amendments, Defendants arbitrarily and capriciously failed to take into account the "Principle of Multiple Deposit Creation" whereby a

bank that has a $100 deposit may lend out $90 of those funds which are later redeposited into other banks, allowing further lending and thereby producing approximately $1,000 in the form of loans and investments or ten times the amount of economic activity of the deposited dollar.  See Comment of Florida Office of Financial Regulation at Fed. Reg. Docket Number 2011-00082 (IRS-2011-0001-0048); see also Federal Reserve Bank of Chicago, Modern Money Mechanics: A Workbook on Bank Reserves and Deposit Expansion (Rev. Ed. 1992), p. 6.

36.     The Amendments took effect on January 1, 2013, with the first annual reports due in March, 2014.  See IRS Instructions for Form 1042-S, p. 1.

37.     Since the finalization of the Amendments, surveys of Plaintiffs' member institutions have indicated substantial deposit outflows and shifting of accounts as had been uniformly predicted by commentators in opposition to the 2011 Proposal.  For example:

(a)     One of the members of the Bankers Associations reported a loss of between 5 and 10 percent of its total non-resident alien deposits;

(b)     One of the members of the Bankers Associations reported an outflow of $50 million in non-resident alien deposits;

(c)     One of the members of the Bankers Associations reported an outflow of $20 million in non-resident alien deposits;

(d)     Several members of the Bankers Associations reported significant shifts of hundreds of millions of dollars from interest bearing accounts to non-interest bearing accounts;[2]

---

[2] As of 2006 the required reserve ratio in the United States was 10% on transaction deposits and zero on time deposits and all other deposits. See bank reserve discussion in Paragraph 32.

(e)    One of the Bankers Associations' members that qualifies as a small business under 5 U.S.C. § 601 and 15 U.S.C. § 602 has reported a loss of 1.2% of its non-resident alien deposits; and

(f)    One of the members of the Bankers Associations reported initial compliance costs incurred of one hundred ninety employee hours and $8,000 in outside consulting expenses.

## THE ADMINISTRATIVE PROCEDURES ACT

38.    The Bankers Associations adopt by reference the preceding paragraphs of this Complaint as if fully set forth herein.

39.    The APA affords adversely affected parties the opportunity to seek review of final agency actions for which there are no other adequate remedies in a court.  5 U.S.C. § 704.

40.     The Amendments constitute final agency action under the terms of the APA. See Cohen v. United States, 650 F.3d 717 (D.C. Cir. 2011).

41.    The APA provides that agency actions are to be set aside when found to be arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or unwarranted by the facts.  5 U.S.C. § 706.

## THE REGULATORY FLEXIBILITY ACT

42.    The Bankers Associations adopt by reference the preceding paragraphs of this Complaint as if fully set forth herein.

43.    Congress enacted the RFA in 1980 to ensure that federal agencies consider the needs of small businesses when new regulations are written.

44.    The RFA requires an agency promulgating new rules to "prepare and make available for public comment an initial regulatory flexibility analysis."  5 U.S.C. § 603(a).  "Such

analysis shall describe the impact of the proposed rule on small entities."  Id.  "The initial regulatory flexibility analysis or a summary shall be published in the Federal Register at the time of the publication of general notice of proposed rulemaking for the rule."  Id.  "In the case of an interpretative rule involving the internal revenue laws of the United States, this chapter applies to interpretative rules published in the Federal Register for codification in the Code of Federal Regulations, but only to the extent that such interpretative rules impose on small entities a collection of information requirement."  5 U.S.C. § 603(a).

45.     The Initial Regulatory Flexibility Analysis must contain: (1) a description of the reasons why action by the agency is being considered; (2) a succinct statement of the objectives of, and legal basis for, the proposed rule; (3) a description of, and where feasible an estimate of, the number of small entities to which the proposed rule will apply; (4) a description of the projected reporting, recordkeeping, and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and (5) an identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap, or conflict with the proposed rule.  See 5 U.S.C. § 603(b).

46.     "Each Initial Regulatory Flexibility Analysis shall also contain a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities."  5 U.S.C. § 603(c).  Such analysis shall discuss significant alternatives, such as: (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities;

(3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities.  See id.

47.     The RFA further provides that "[w]hen an agency promulgates a final rule under section 553 of this title, after being required by that section or any other law to publish a general notice of proposed rulemaking, or promulgates a final interpretative rule involving the internal revenue laws of the United States as described in section 603(a), the agency shall prepare a final regulatory flexibility analysis."  5 U.S.C. § 604(a).

48.     The Final Regulatory Flexibility Analysis must contain: (1) a statement of the need for, and objectives of, the rule; (2) a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments; (3) the response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments; (4) a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available; (5) a description of the projected reporting, recordkeeping, and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and (6) a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one

of the other significant alternatives to the rule considered by the agency which affect the impact

on small entities was rejected.  5 U.S.C. § 604(a).

49.     Section 605 of the RFA provides that "[s]ections 603 and 604 of this title shall not

apply to any proposed or final rule if the head of the agency certifies that the rule will not, if

promulgated, have a significant economic impact on a substantial number of small entities."  5

U.S.C. § 605(b).  "If the head of the agency makes a certification under the preceding sentence,

the agency shall publish such certification in the Federal Register at the time of publication of

general notice of proposed rulemaking for the rule or at the time of publication of the final rule,

along with a statement providing the factual basis for such certification."  Id.

50.     The RFA expressly provides that any "small entity that is adversely affected or

aggrieved by final agency action is entitled to judicial review of agency compliance with the

requirements of sections 601, 604, 605(b), 608(b), and 610 in accordance with [5 U.S.C. § 701,

et seq.]."  5 U.S.C. § 611(a).

51.     "In granting any relief in an action under [5 U.S.C. § 611], the court shall order

the agency to take corrective action consistent with this chapter and chapter 7, including, but not

limited to: (A) remanding the rule to the agency, and (B) deferring the enforcement of the rule

against small entities unless the court finds that continued enforcement of the rule is in the public

interest."  5 U.S.C. § 611(a)(4).

## COUNT ONE:  DECLARATORY JUDGMENT THAT DEFENDANTS DID NOT COMPLY WITH THE APA IN PROMULGATING THE AMENDMENTS

52.     The Bankers Associations adopt by reference the preceding paragraphs of this

Complaint as if fully set forth herein.

53.     Defendants violated the APA by arbitrarily and capriciously declaring that the Amendments were not subject to the APA.  In doing so, Defendants circumvented the procedural safeguards set forth in the APA.

54.     Defendants acted arbitrarily and capriciously by promulgating the Amendments, which are far reaching and overly burdensome on banks operating in the United States, without developing the kind of detailed and factual administrative record contemplated by the APA.

55.     Defendants acted arbitrarily and capriciously by failing to consider and respond to significant comments and now actual evidence as to the deposit outflow caused by the adoption of the Amendments.

56.     Defendants acted arbitrarily and capriciously by failing to make a rational connection between the costs and benefits, if any, of the Canadian experience vis-à-vis other foreign countries, especially as pertains to those with unstable governmental and political environments.

57.     Defendants acted arbitrarily, capriciously, and contrary to Congressional intent by reversing their prior positions that reporting requirements such as those contained in the Amendments are overly broad an unnecessary.

58.     Because the Defendants' promulgation of the Amendments was arbitrary and capricious, the Bankers Associations respectfully request that the Court enter a declaratory judgment holding that the Amendments are invalid and otherwise unenforceable.

### COUNT TWO:  DECLARATORY JUDGMENT THAT DEFENDANTS DID NOT COMPLY WITH THE RFA IN PROMULGATING THE AMENDMENTS

59.     The Bankers Associations adopt by reference the preceding paragraphs of this Complaint as if fully set forth herein.

60.     The RFA requires agencies promulgating rules to issue an Initial Regulatory Flexibility Analysis and a Final Regulatory Flexibility Analysis.  See 5 U.S.C. §§ 603, 604. Alternatively, the RFA permits agencies to circumvent the flexibility analyses requirements when the agency can certify that the proposed "rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."  5 U.S.C. § 605(b).  In such circumstances, the agency must publish "a statement providing the factual basis for such certification."  Id.

61.     In promulgating the Amendments, Defendants failed to issue an Initial Regulatory Flexibility Analysis and/or a Final Regulatory Flexibility Analysis.  To the contrary, Defendants "certified that the collection of information contained in these regulations will not have a significant economic impact on a substantial number of small entities."  See Amendments 77 Fed. Reg. 23391 at 23393-94.  Defendants failed, however, to publish "a statement providing the factual basis for such certification."  5 U.S.C. § 506(b).

62.     Because Defendants failed to comply with the RFA in promulgating the Amendments, the Bankers Associations respectfully request that the Court enter a declaratory judgment holding that the Amendments are invalid and otherwise unenforceable.

## COUNT THREE:  ORDER STAYING ENFORCEMENT
## OF THE AMENDMENTS

63.     The Bankers Associations adopt by reference the preceding paragraphs of this Complaint as if fully set forth herein.

64.     Because Defendants failed to provide an Initial Regulatory Flexibility Analysis and/or a Final Regulatory Flexibility Analysis and because Defendants failed to publish the factual basis for their certification that the Amendments would not have a significant economic impact on a substantial number of small entities, Defendants failed to comply with the RFA.

65.     The Bankers Associations are entitled to a preliminary injunction and/or order staying the effective date of the Amendments because there is a substantial likelihood that they will (a) succeed on the merits of their claims to invalidate the Amendments; (b) the Bankers Associations' members will suffer irreparable harm if the Amendments are not invalidated; (c) the balance of hardship tips in favor of the Bankers Associations if a preliminary injunction is not issued to stay enforcement of the Amendments; and (4) the public interest lies in granting injunctions against regulations that are promulgated in violation of the APA and the RFA.

66.     Accordingly, the Bankers Associations respectfully request that the Court enter an order staying the effective date of the Amendments pursuant to 5 U.S.C. § 611(a)(5) and/or 5 U.S.C. § 705.

**WHEREFORE**, the Bankers Associations respectfully request that the Court enter a preliminary injunction staying the effective date of the amendments to 26 C.F.R. §§ 1.6049-4(b)(5) and 1.6049-8 set forth in 77 Fed. Reg. 23391 and a final judgment:

(a)     declaring that the amendments to 26 C.F.R. §§ 1.6049-4(b)(5) and 1.6049-8 set forth in 77 Fed. Reg. 23391 were promulgated in violation of the Regulatory Flexibility Act and are, therefore, invalid;

(b)     staying the effective date of the amendments to 26 C.F.R. §§ 1.6049-4(b)(5) and 1.6049-8 set forth in 77 Fed. Reg. 23391 pursuant to 5 U.S.C. § 611(a)(5) and/or 5 U.S.C. § 705;

(c)     invalidating the amendments to 26 C.F.R. §§ 1.6049-4(b)(5) and 1.6049-8 set forth in 77 Fed. Reg. 23391 pursuant to 5 U.S.C. § 706; and

(d)     awarding such other and further relief as the Court deems just and proper.

[Signatures on following page]

Respectfully submitted this <u>18th</u> day of April, 2013.

/s/ *James J. Butera*
James J. Butera
D.C. Bar No. 164335
Ryan D. Israel
D.C. Bar No. 488498
*Application for Admission to this Court Pending*
**JONES WALKER LLP**
499 S. Capitol Street SW, Suite 600
Washington, D.C. 20003
Telephone:      (202) 203-1020
Facsimile:       (202) 203-0000
Email:  jbutera@joneswalker.com
            risrael@joneswalker.com

Steven F. Casey
*Application for Admission to this Court Pending*
David A. Lester
D.C. Bar No. 977930
*Application for Admission to this Court Pending*
**JONES WALKER LLP**
1819 5th Avenue North, Suite 1100
Birmingham, Alabama 35203
Telephone:      (205) 244-5200
Facsimile:       (205) 244-5400
Email:  scasey@joneswalker.com
            dlester@joneswalker.com

**ATTORNEYS FOR PLAINTIFFS, FLORIDA
BANKERS ASSOCIATION AND
TEXAS BANKERS ASSOCIATION**

**Please Serve Defendants by Certified Mail, return receipt requested, at:**

United States Department of the Treasury
c/o United States Department of Justice
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530

United States Department of the Treasury
c/o Eric Holder, Attorney General of the United States
United States Department of Justice
Office of the Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

United States Department of the Treasury
Office of the General Counsel
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

Mr. Jack Lew, Secretary of the Treasury
c/o United States Department of Justice
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530

Mr. Jack Lew, Secretary of the Treasury
c/o Eric Holder, Attorney General of the United States
United States Department of Justice
Office of the Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Mr. Jack Lew, Secretary of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

Internal Revenue Service
c/o United States Department of Justice
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530

Internal Revenue Service
c/o Eric Holder, Attorney General of the United States
United States Department of Justice
Office of the Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Internal Revenue Service
Office of the General Counsel
1111 Constitution Avenue, N.W.
Washington, D.C. 20224

Mr. Steven T. Miller, Acting Commissioner of Internal Revenue
c/o United States Department of Justice
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530

Mr. Steven T. Miller, Acting Commissioner of Internal Revenue
c/o Eric Holder, Attorney General of the United States
United States Department of Justice
Office of the Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Mr. Steven T. Miller, Acting Commissioner of Internal Revenue
Internal Revenue Service
1111 Constitution Avenue, N.W.
Washington, D.C. 20224