# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FLORIDA BANKERS ASSOCIATION, *et al.*,

      **Plaintiffs,**

          **v.**

UNITED STATES DEPARTMENT OF TREASURY, *et al.*,

      **Defendants.**

Civil Action No. 13-529 (JEB)

## MEMORANDUM OPINION

In 2012, the Internal Revenue Service issued new income-reporting requirements aimed at detecting and deterring tax cheats at home and abroad. Specifically, the regulations required U.S. banks to report the amount of interest earned by accountholders residing in foreign countries. These reports will help the United States comply with various exchange treaties, under which other countries provide our Government with information about American taxpayer assets held in offshore accounts in exchange for information from us about foreign assets sitting in U.S. banks.

The Florida and Texas Bankers Associations now challenge those reporting requirements, alleging that the regulations violate the Administrative Procedure Act and the Regulatory Flexibility Act. The Bankers Associations contend, in a Motion for Summary Judgment, that the IRS got the economics of its decision wrong and that the requirements will cause far more harm to banks than anticipated. Because the Service reasonably concluded that the regulations will improve U.S tax compliance, deter foreign and domestic tax evasion, impose a minimal reporting burden on banks, and not cause any rational actor – other than a tax evader – to withdraw his

funds from U.S. accounts, the Court upholds the regulations and grants the Government's Cross-Motion for Summary Judgment.

## I.    Background

### A.    Regulatory Background

This case revolves around new IRS reporting requirements for U.S. banks.  For some time now, banks have been required to report interest earned by U.S. citizens and residents.  <u>See</u> 26 U.S.C. § 6049; Form 1099-INT.  That interest is taxed by the IRS.  26 U.S.C. §§ 1, 63(a).  Recently, however, the Service also began requiring banks to report the interest paid to certain non-resident aliens, despite the fact that such aliens do not pay U.S. taxes on their interest.  <u>See</u> 26 U.S.C. § 871(i)(2)(A).  A brief overview of the motivation for such regulations and their procedural background may prove helpful here.

#### 1.    *Tax Compliance and Off-Shore Accounts*

The IRS is on a constant quest to bridge the so-called "tax gap" – that is, the $450 billion gap between what taxpayers owe the government and what they actually pay.  <u>See</u> <u>The Tax Gap</u>, IRS, http://www.irs.gov/uac/The-Tax-Gap (last visited Jan. 10, 2014).  Part of this gap is caused by a lack of taxpayer candor regarding assets retained in off-shore accounts.  While U.S. citizens and residents owe taxes on the interest meted out by foreign banks, much of those off-shore earnings go unreported and undetected.  <u>See, e.g.</u>, Administrative Record at 5822 (IRS Commissioner Doug Schulman's Statement on UBS/Voluntary Disclosure Program (November 16, 2010)) (revealing over 15,000 undisclosed foreign accounts).

This problem arises because the IRS's collection efforts are "based on a system of self-reporting."  <u>United States v. Bisceglia</u>, 420 U.S. 141, 145 (1975).  Essentially, "the Government depends upon the good faith and integrity of each potential taxpayer to disclose honestly all

information relevant to tax liability." Id. Honesty, however, may not be every American taxpayer's greatest virtue. As a result, the Government also relies on third-party reporting, matching, and verification to confirm the correct amount of taxpayer liability and to encourage accurate self-reporting. See, e.g., AR 5827 (Citizens for Tax Justice, The Tax Cheaters' Lobby Is Wrong About IRS Proposed Regulations (January 31, 2011)) (confirming that taxpayer honesty climbs when third parties disclose income to IRS).

Getting foreign banks to report income earned by U.S. taxpayers, however, has proven to be a challenge. Many countries, for instance, make such reporting illegal. See, e.g., id. (noting foreign bank-secrecy laws); AR 6454 (OECD Model Tax Convention on Income and on Capital, Article 26, Exchange of Information (July 22, 2010)) (attempting to put an end to such laws). As a result, the United States has entered into treaties with at least 70 foreign governments to provide for the exchange of tax information upon request. See Rev. Proc. 2012-24 § 3; AR 6816 (Model Tax Convention on Income and on Capital, Commentary on Article 26, Exchange of Information (July 22, 2010)); see, e.g., United States v. Stuart, 489 U.S. 353 (1989). At least one treaty – our exchange agreement with Canada – provides for the automatic exchange of that information. See Rev. Proc. 2012-24 § 4; AR 6885-907 (Protocol Amending the Convention Between the United States and Canada With Respect to Taxes on Income and on Capital (September 21, 2007)).

Reciprocity is the key to success in such treaties. If the United States does not gather and report tax information for foreign accountholders, then other countries have little incentive to provide us with similar information. See Guidance on Reporting Interest Paid to Nonresident Aliens, Final Regulations, 77 Fed. Reg. 23,391, 23,391 (April 12, 2012) (effectiveness of exchange agreements "depends significantly . . . on the United States' ability to reciprocate");

AR 7281-82 (Comment, Financial Accounting and Corporate Transparency (FACT) Coalition (May 18, 2011)) (reiterating the point); AR 7215-16 (Comment, Individual from Switzerland (February 22, 2011)) (same). This is the backdrop against which the challenged regulations must be considered.

2. *Statutory and Regulatory Scheme*

a. Prior Regulatory Action

Even before the promulgation of the regulations at issue in this case, the IRS required banks to report the interest earned by at least some non-resident aliens – namely, Canadian citizens. Because our agreement with Canada involves the automatic exchange of tax information, the IRS long ago tasked banks with collecting data on Canadian citizens' accounts. See Information Reporting and Backup Withholding, 61 Fed. Reg. 17,572 (Apr. 22, 1996). Banks share this data with the IRS through Form 1042-S, which reports the interest paid to each Canadian accountholder, and through Form 1042, which contains the total amount of interest paid to those accountholders in a given tax year.

In 2001, the Government proposed extending these reporting requirements to non-resident aliens from all countries. See Guidance on Reporting of Deposit Interest Paid to Nonresident Aliens, 66 Fed. Reg. 3925 (Jan. 17, 2001), corrected at 66 Fed. Reg. 15,820 (Mar. 21, 2001) and 66 Fed. Reg. 16,019 (Mar, 22, 2001). The proposal, however, was never enacted. See Guidance on Reporting of Deposit Interest Paid to Nonresident Aliens, 67 Fed. Reg. 50,386 (Aug. 2, 2002).

b. 2011 Notice of Proposed Rulemaking

A decade later, that proposal was revived. See Guidance on Reporting Interest Paid to Nonresident Aliens, Notice of Proposed Rulemaking; Notice of Public Hearing; and Withdrawal

4

of Previously Proposed Rulemaking, 76 Fed. Reg. 1105 (Jan. 7, 2011). In the IRS's 2011 Notice of Proposed Rulemaking, the Agency put forward regulations that would require U.S. banks to report the interest paid to all non-resident aliens. See id. The Agency claimed that such regulations were warranted as a result of the "growing global consensus" that "cooperative [tax] information exchange[s]" were necessary to apprehend tax cheats. Id. at 1106. "[R]outine reporting" of non-resident tax information would, it said, "strengthen the United States exchange of information program" and thus "help to improve voluntary compliance" with existing tax laws by U.S. taxpayers. Id. The IRS also invited comments and scheduled a public hearing. Id.

Although many of the comments received from financial institutions were critical of the proposal, see AR 7370-83 (Summary of Public Hearing on Proposed Regulations, Internal Revenue Service (May 18, 2011)), others were supportive. The Financial Accountability and Corporate Transparency Coalition, for example, noted that "America should not be a haven for international tax evaders." Comment, FACT Coalition at 7281. Senator Carl Levin commended the proposal for deterring the use of "offshore mechanisms to hide taxable income." AR 7097 (Comment, Sen. Carl Levin, Chairman, Permanent Subcommittee on Investigations (April 12, 2012)). He further praised the proposal for creating no new burden on banks, since most banks "already have in place comprehensive automated systems to produce needed information to the IRS" from the existing Canadian reporting requirements. Id. at 7099.

Other comments, conversely, noted that the regulations seemed overbroad. See, e.g., AR 6017 (Hearing Statement, Before the House Committee on Financial Services, 112th Congress, J. Thomas Cardwell, Former Commissioner, Florida Office of Financial Regulation (October 27, 2011)). While the United States has exchange agreements with only 70 countries, the proposed amendments required reporting for all 196 countries worldwide. Commenters also worried about

the confidentiality of the information collected and the potential risk of "capital flight" – that is, non-residents' closing their accounts and withdrawing their money due to the new regulations. See AR 6994 (Florida Congressional Delegation Letter to the President (March 2, 2011)); 7209 (Comment, Zions Bancorporation (Norman Merritt, Executive Vice President) (March 24, 2011)).

c. Final 2012 Rule

The final rule, which was issued in 2012, responded to these comments by preserving the core of the amendment while somewhat narrowing and clarifying the regulations. 77 Fed. Reg. 23,391. Pursuant to the final rule, effective January 1, 2013, banks are now required to report interest payments to non-resident aliens, but only for aliens from countries with which the United States has an exchange agreement. The reports utilize the same forms already employed to report Canadian non-resident income, Forms 1042 and 1042-S. The IRS thereby hoped to ease any reporting burden on the banks.

In the preamble to the final rule, the IRS explained why it felt that such an amendment was necessary. Expanded reporting was, it claimed, "essential to the U.S. Government's efforts to combat offshore tax evasion." 77 Fed. Reg. at 23,391. Since exchange agreements require mutuality, the regulations "ensure that the IRS is in a position to exchange such information reciprocally with a treaty partner." Id. Such reciprocity also aids overseas compliance with the Foreign Account Tax Compliance Act, which "require[s] overseas financial institutions to identify U.S. accounts and report information (including interest payments) about those accounts to the IRS." Id. at 23,392. Finally, the IRS observed, "[R]eporting of information required by these regulations will also directly enhance U.S. tax compliance by making it more difficult for

U.S. taxpayers with U.S. deposits to falsely claim to be nonresidents in order to avoid U.S. taxation." Id.

In addition, the IRS responded to the various concerns raised in the comments it received. As noted, the rule narrowed the reporting requirement to countries with which the United States has an exchange agreement. The Service also addressed confidentiality questions by noting that "all of the information exchange agreements to which the United States is a party require that the information exchanged under the agreement be treated and protected as secret by the foreign government." Id. In terms of capital flight, the IRS reasoned that "these regulations should not significantly impact the investment and savings decisions of the vast majority of non-residents who are aware of and understand these safeguards and existing law and practice." Id. at 23,393. Their information, after all, would remain confidential and could only detrimentally affect them if they were evading their countries' tax laws.

The IRS also certified, under the Regulatory Flexibility Act, that the regulations would "not have a significant economic impact on a substantial number of small entities." Id. at 23,393-94. While the IRS conceded that the regulations would affect many small banks, it determined that they would not have a "significant economic impact" because banks have already "developed the systems to perform . . . withholding and reporting" for U.S. citizens, residents, and Canadian citizens. Id. at 23,394. "U.S. financial institutions can," therefore, "use their existing W-8 information" – which contains data on residency and citizenship for all accountholders – "to produce Form 1042-S disclosures for the relevant nonresident alien individual account holders. Nearly all U.S. banks and other financial institutions have automated systems to produce" those forms. Id.

In sum, the IRS determined, despite some opposition, that the regulations were essential to deterring and apprehending tax evaders, both foreign and domestic. The new rule, moreover, would cause minimal burden to banks and their customers. The amendments were therefore enacted.

B.      Factual and Procedural History

Plaintiffs Florida Bankers Association and Texas Bankers Association are two organizations that advocate for banks both large and small in their respective states. See Pl. Mot., Exh. A (Declaration of Pamela Potter Ricco); Exh. B (Declaration of J. Eric T. Sandberg, Jr.). Collectively, they represent over 800 banks, at least 300 of which qualify as small businesses. See Ricco Decl.; Sandberg Decl. Seeking injunctive and declaratory relief, Plaintiffs sued the Department of Treasury, its Secretary, the IRS, and the Commissioner of Internal Revenue under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and the Regulatory Flexibility Act, 5 U.S.C. §§ 601-12.[1]  Both sides now move for summary judgment.

II.     **Legal Standard**

Plaintiffs rely on the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, to challenge the interest-reporting regulations. Although the parties have now filed dueling Motions for Summary Judgment, the limited role federal courts play in reviewing administrative decisions means that the typical Federal Rule 56 summary-judgment standard does not apply. See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006) (citing Nat'l Wilderness Inst. v.

---

[1] In their opening brief, the Bankers Associations also raised concerns regarding compliance with certain Executive Orders. See Pl. Mot. at 28-30 (citing Exec. Order 12886; Exec. Order 13563). Those objections, however, were not renewed in Plaintiffs' Reply – perhaps because, as the Government notes, the Executive Orders cannot give rise to a cause of action. See, e.g., Exec. Order 12886 § 10 (Order "is intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law"); Exec. Order 13563 § 7(d) (similar); see also Air Transp. Ass'n of America v. FAA, 169 F.3d 1, 8 (D.C. Cir. 1999) (such disclaimers preclude judicial review). Because Plaintiffs seem to concede that claims under the Executive Orders are unreviewable, the Court need not further address the issue.

United States Army Corps of Eng'rs, 2005 WL 691775, at *7 (D.D.C. 2005)). Instead, in APA cases, "the function of the district court is to determine whether or not . . . the evidence in the administrative record permitted the agency to make the decision it did." Id. (internal citations omitted). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and otherwise consistent with the APA standard of review. See Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002) (citing Richards v. INS, 554 F.2d 1173, 1177 (D.C. Cir. 1977)).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009). It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). Under this "narrow" standard of review – which appropriately encourages courts to defer to the agency's expertise, see Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) – an agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. (internal quotation marks omitted). In other words, courts "have held it an abuse of discretion for [an agency] to act if there is no evidence to support the decision or if the decision was based on an improper understanding of the law." Kazarian, 596 F.3d at 1118. The substantial evidence required by the APA is "more than a scintilla, but . . . something less than a preponderance of the evidence." Fla. Gas Transmission Co. v. FERC, 604 F.3d 636, 645 (D.C. Cir. 2010) (citation omitted).

It is not enough, then, that the court would have come to a different conclusion from the agency. See Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835, 841 (9th Cir. 2003). The reviewing court "is not to substitute its judgment for that of the agency," id., nor to "disturb the decision of an agency that has examine[d] the relevant data and articulate[d] . . . a rational connection between the facts found and the choice made." Americans for Safe Access v. DEA, 706 F.3d 438, 449 (D.C. Cir. 2013) (internal quotation marks and citation omitted). A decision that is not fully explained, moreover, may be upheld "if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974). Simply put, if the agency's decision was reasonable and is supported by some record evidence, it will survive APA review.

## III. Analysis

In its Cross-Motion, the Government first raises two potential jurisdictional bars to this suit: lack of standing and the Anti-Injunction Act. After considering those threshold questions and finding that it does have jurisdiction, the Court next separately addresses Plaintiffs' claims that the IRS regulations violate the APA and the RFA.

### A. Standing

As this Court has previously observed, "Not every disagreement merits a lawsuit." Scenic America, Inc. v. Department of Transportation, 2013 WL 5745268, at *3 (D.D.C. 2013). Federal courts decide only "cases or controversies," which have long been defined through the doctrine of standing. See Whitmore v. Arkansas, 495 U.S. 149, 154-55 (1990); U.S. Const. art. III. To have standing to bring a lawsuit in federal court, a plaintiff must establish that: (1) it has suffered an injury in fact; (2) its injury is fairly traceable to the allegedly unlawful conduct; and (3) a favorable ruling would redress its injuries. Lujan v. Defenders of Wildlife, 504 U.S. 555,

560-61 (1992); International Broth. of Teamsters v. Dept. of Transp., 724 F.3d 206, 211 (D.C. Cir. 2013). As organizational plaintiffs, furthermore, the Bankers Associations may have standing to appear on their members' behalf. See Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 342-43 (1977). "An organization has standing to seek injunctive relief" on behalf of its members "if at least one of its members would have standing and if the issue is germane to the organization's purpose." International Broth. of Teamsters, 724 F.3d at 211.

Here, the Government contends that Plaintiffs have not submitted an affidavit identifying by name a specific member who has been injured. They thus argue that Plaintiffs cannot show the organizational standing necessary to pursue this suit.

Defendants, however, ask too much. As the D.C. Circuit has noted, "In many if not most cases the petitioner's standing to seek review of administrative action is self-evident; no evidence outside the administrative record is necessary for the court to be sure of it." Sierra Club v. EPA, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (emphasis added). Especially when "the complainant is 'an object of the [regulatory] action (or forgone action) at issue'" – as are Plaintiffs' members here – "there should be 'little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" Id. at 900 (quoting Lujan, 504 U.S. at 561-62). Only "[w]hen the petitioner's standing is not self-evident" – generally, when the Plaintiff is an unregulated third-party – must it "supplement the record" with an affidavit. Id. The D.C. Circuit has further stated that an "association has an obvious interest in challenging [agency] rulemaking that directly – and negatively – impacts its . . . members." American Trucking Associations, Inc. v. Federal Motor Carrier Safety Admin., 724 F.3d 243, 247 (D.C. Cir. 2013).

In this case, Plaintiffs' member banks are directly regulated by the regulations being challenged. They are currently suffering from additional, allegedly unlawful reporting requirements, causing them injury. That injury would undoubtedly be redressed by abrogation of the regulations. Because such a lawsuit "is germane to the organization[s'] purpose," which involves policy advocacy on behalf of financial institutions, the Bankers Associations have standing to sue for injunctive and declaratory relief on their members' behalf. International Broth. of Teamsters, 724 F.3d at 211. Standing, therefore, presents no impediment to this action.

B. Anti-Injunction Act

Defendants' next position is somewhat more unusual. They contend that, even if Article III does not bar this suit, the Anti-Injunction Act – or its twin, the Declaratory Judgment Act – does. The AIA states: "[N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). "The manifest purpose of [the AIA] is to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund." Enochs v. Williams Packing & Nav. Co., 370 U.S. 1, 7 (1962). "The AIA has 'almost literal effect': It prohibits only those suits seeking to restrain the assessment or collection of taxes." Cohen v. United States, 650 F.3d 717, 724 (D.C. Cir. 2011) (*en banc*) (quoting Bob Jones Univ. v. Simon, 416 U.S. 725, 737 (1974)). The Declaratory Judgment Act's sweep is the same as that of the AIA, although it bars declaratory rather than injunctive relief. Id. at 727-31.

At first glance, the Government's argument that the AIA and DJA apply seems misguided. The Bankers Associations are, after all, only challenging a reporting requirement – not the "assessment or collection of any tax." 26 U.S.C. § 7421(a). As Defendants point out,

12

however, failure to follow the Chapter 61A reporting requirements at issue here can trigger a $100 penalty under Chapter 68B, which is then treated as a tax. See 26 U.S.C. § 6049 (reporting requirement); id. § 6721(a) (penalty); see also Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2583 (2012) (noting that such Chapter 68B penalties are treated as taxes for purposes of the AIA). So, in theory, gutting the regulations could restrain the assessment and collection of these yet-unaccrued penalties.

The Anti-Injunction Act, moreover, does have a broad sweep. The Supreme Court has held that "[s]o long as the imposition of a federal tax, without regard to its nature, follows from the" Government's challenged action, then the suit is barred by the AIA. Alexander v. "Americans United" Inc., 416 U.S. 752, 762 n.13 (1974). But its sweep is not so broad as to cover the reporting requirements challenged here. In this case, the imposition of a federal tax does not necessarily follow from the promulgation of the reporting requirements, and no tax has yet been incurred. A tax would be imposed here only if one of Plaintiffs' members refused to comply with the reporting requirements – and none has threatened to do so. The Bankers Associations take no issue with possible penalties; rather, their target is the regulation itself.

The D.C. Circuit has confirmed that reporting requirements related to Chapter 61A of the Internal Revenue Code – as opposed to the associated penalties found in Chapter 68B – are not subject to the AIA or DJA. In Foodservice and Lodging Institute, Inc. v. Regan, 809 F.2d 842 (D.C. Cir. 1987), the plaintiffs challenged an IRS regulation that required restaurants to report the amount of tips collected in a given year. The Court observed that, "[o]n its face, the regulation does not relate to the assessment or collection of taxes, but to IRS efforts to determine the extent of . . . compliance" with other tax provisions. Id. at 846. Even though this reporting requirement would similarly be subject to Chapter 68B penalties for non-compliance, the Court

held that the AIA did not apply. See 26 U.S.C. 6053(c)(1) (tip-reporting requirement); id. § 6721(a) (penalty). This Court can hardly hold to the contrary.

Although the Court owes some deference to the Government's opinion of whether or not the AIA applies, see Seven-Sky v. Holder, 661 F.3d 1, 13 (D.C. Cir. 2011), abrogated on other grounds by Nat'l Fed'n of Indep. Bus., 132 S. Ct. 2566, it must nevertheless heed the D.C. Circuit's admonition that the AIA does not bar suits like this one brought merely for "purpose of enjoining a regulatory command." Id. at 8. Indeed, the AIA "has never been applied to bar suits brought to enjoin regulatory requirements that bear no relation to tax revenues or enforcement," even if a tax-related penalty could follow. Id. at 9. And the regulations at issue here, like the Foodservice reporting requirement, fit that bill. As the DJA and AIA are coterminous, neither Act prevents the Bank Associations' suit.

C. APA

Those preliminary issues resolved, the Court may now consider Plaintiffs' claims on the merits, beginning with their APA challenge. The Bankers Associations contend, in essence, that the IRS misunderstood the economics of its decision and that the regulations will be more harmful to banks than the Service realized. Plaintiffs' assumption is that the Government would not move to comply with its treaty obligations and deter tax cheats if doing so harmed banks in any appreciable way. Because the IRS's decisions here are both eminently reasonable and supported by the evidence, the Court disagrees.

1. *Amount of Deposits*

Plaintiffs catalog a lengthy list of nits to pick with the IRS regulations. First, the Bankers Associations contend that because the IRS did not know exactly how much money non-resident aliens have deposited in U.S. banks, its decision was not supported by substantial evidence.

5 U.S.C. § 706(2)(E).  Putting aside the fact that the "substantial evidence" standard does not typically apply to notice-and-comment rulemaking, id., Plaintiffs' arguments are unavailing – whether the substantial-evidence or arbitrary-and-capricious standard is applied.

The IRS admits that it does not know exactly how much money non-resident aliens have deposited in U.S. banks.  It notes, however, that gathering that information is one critical point of the regulations – to figure out how much money foreign residents hold in U.S. accounts and how much interest they are earning.  See Gov't Mot. at 15.  As the Government highlights, it makes little sense to require an agency to possess the data it wishes to collect before enacting new data-collecting requirements.  See id.; Inv. Co. Inst. v. CFTC, 720 F.3d 370, 379 (D.C. Cir. 2013) (citation omitted) ("the law does not require agencies to measure the immeasurable").

Instead of using exact data, the IRS estimated, based on a mountain of existing information from the Treasury Department, that non-resident alien deposits in U.S. banks amounted to no more than $400 billion.  See AR 222 (Treasury International Capital Data, Canadian Depositors, Department of Treasury (1983)); see also AR 189-98, 415-25 (Treasury International Capital Data).  Plaintiffs argue that such an estimate does not comport with the APA.  But nothing in the APA forbids a government agency from estimating.  See, e.g., Chamber of Commerce v. SEC, 412 F.3d 133, 143 (D.C. Cir. 2005) (even "in face of uncertainty, agency must exercise its expertise to make tough choices . . . and to hazard a guess as to which is correct, even if . . . the estimate will be imprecise") (internal quotation marks and citation omitted).  Rather, the APA merely requires an agency to "examine the relevant data and articulate . . . a rational connection between the facts found and the choice made."  State Farm Mut. Auto. Ins. Co., 463 U.S. at 43.  The IRS did just that here – by using the "relevant data" to form a reasonable estimate, and by choosing to move forward despite the amount of money that

could be affected.  The Treasury data used were quite extensive and are certainly substantial enough to comport with the APA.

In addition – as explained more extensively below – the IRS's estimate of how much money could be affected was not central to its decision to proceed with these regulations.  The estimate was not even published in the Federal Register; it appears only in the administrative record.  The IRS was unconcerned because it had determined that very little of this money would be affected – namely, because these regulations would not deter any rational actor other than a tax fraud from using U.S. banks.  See 77 Fed. Reg. at 23,393 ("The Treasury Department and the IRS believe that . . . these regulations should not significantly impact the investment and savings decisions of the vast majority of non-residents who are aware of and understand [the relevant privacy] safeguards and existing law and practice.").  Even if the estimate was a ballpark figure, then, the use of that number did not make the Agency's conclusion unreasonable under the APA.

### 2. *Additional Countries Covered*

The Bankers Associations next argue that the expansion from reporting the earnings of citizens of one foreign country – Canada – to reporting income earned by citizens of an additional 70 countries was unwarranted.  Their principal objection is that Canada differs in important respects from many of the other countries on the list, such as China and Egypt.  See Pl. Mot. at 18.  Had those differences been taken into account, Plaintiffs argue, the expansion would not have been justified.

No one with a passport would gainsay that the 70 covered countries diverge significantly in, *inter alia*, their populations, forms of government, and financial systems.  For all their differences, however, those countries have one very important similarity to Canada: each has entered into an exchange treaty with the United States, as the IRS explained in the preamble to

the final regulation.  <u>See</u> 77 Fed. Reg. at 23,393 ("these final regulations revise the 2011

proposed regulations to require reporting only in the case of interest paid to a non-resident alien

individual resident in a country with which the United States has in effect an information

exchange agreement").  Especially in light of the fact that the IRS narrowed its list from all 196

countries worldwide to our 70 treaty partners, it was hardly arbitrary or capricious to extend the

reporting requirements to that specific group.  Indeed, because the regulations are geared toward

improving our treaty compliance, it would not make much sense to narrow the group any further.

This choice, then, presents no obstacle to the IRS under the APA.

### 3.  *Current Reporting Procedures*

The Bankers Associations also fault the IRS for not explaining why routine reporting is

preferable to issuing summonses for information on a case-by-case basis, which the IRS already

has the authority to do.  Again, Plaintiffs ask too much of the Service.  It is obviously easier to

receive information routinely than to issue a series of summonses whenever a treaty partner

requests information.  As the IRS noted in the preamble to the rule, its objective was to "ensure

that [it] is in a position to exchange [tax] information reciprocally with a treaty partner when it is

appropriate to do so."  <u>Id.</u> at 23,391.  That is, the objective is to have the information on hand

when a treaty partner requests it – not to have access to it only at some later date after a

summons is issued and responded to.  In addition, automatic exchange agreements would not be

possible without records that could automatically – as opposed to slowly and manually – be

passed between countries.  <u>See</u> <u>id.</u> at 23,393 ("in appropriate circumstances, the IRS might

exchange certain information on an automatic basis").  Because this commonsense point was

made clear in the regulation's preamble, the IRS did not need to offer an exegesis on the relative

utility of summonses.  The explanation offered suffices for APA review.

4.   *Capital Flight*

At the heart of the Bankers Associations' argument – albeit buried somewhat in their brief – is the contention that the regulations should not have been issued given the negative impact they may have on banks.  Plaintiffs claim that the IRS "disregarded" a flood of comments arguing that the new regulations would cause non-residents to withdraw their deposits *en masse* and thereby trigger substantial and harmful capital flight.  <u>See</u> Pl. Mot. at 21-22.  The IRS, however, did not ignore those comments; indeed, it dedicated a majority of the preamble to addressing concerns about capital flight.  <u>See</u> 77 Fed. Reg. 23,392-93.

Many of the comments on this topic related to the privacy of customers' tax information.  In its preamble, the IRS noted that some comments "expressed concerns that the information required to be reported under th[e] regulations might be misused" or disclosed to rogue governments.  <u>See</u> <u>id.</u> at 23,392.  Those privacy concerns, commenters worried, might trigger an exodus of foreign funds.  To address those fears, the IRS described in great detail the privacy protections that were in place to safeguard account information, including the fact that "all of the information exchange agreements to which the United States is a party require that the information exchanged under the agreement be treated and protected as secret by the foreign government" as well as by the IRS.  <u>See</u> <u>id.</u>  As a result of those protections, the Government concluded that the "regulations should not significantly impact the investment and savings decisions of the vast majority of non-residents."  <u>Id.</u> at 23,393.  In other words, the Government reasonably determined that the privacy concerns expressed by commenters would not spur capital flight.

Of course, there is another potential driver of capital flight: If some of the banks' customers are tax evaders, they would clearly have an incentive to withdraw their funds as a

result of the new regulations. Leaving the undisclosed funds in American banks might have unfortunate consequences in their homelands for those accountholders. Banks judiciously declined to raise that motivation for capital flight in their comments, and they do not press the point here. For the same reason, the IRS does not discuss the potential flight of tax evaders in its preamble, since a central purpose of the regulations is to deter foreign tax cheats.

To the extent that Plaintiffs imply that any regulation that harms banks – including one that causes tax evaders to flee – should fail APA review, they cannot pass the blush test. The Government need not issue a disclaimer stating, "No banks will lose deposits as the United States helps to apprehend tax evaders," and the APA does not require the IRS to pass only regulations that are good for banks. Balancing such costs and benefits is a policy choice for the Executive branch to make; the APA requires only that those choices be cogently explained. Here, they were. The Government noted that the "vast majority of nonresidents" would not withdraw their funds, id., and that the regulations were "essential to the U.S. Government's efforts to combat offshore tax evasion." Id. at 23,391. If a small minority of investors chooses to withdraw its funds to continue evading taxes, the Executive was willing to take the tradeoff, and the tradeoff is the Executive's to make.

Plaintiffs raise one additional, related issue: They claim that the IRS ignored the massive capital flight that took place after the Canadian reporting requirements became effective in January 2000. See 63 Fed. Reg. at 72,183 (Dec. 31, 1998). The IRS, by contrast, contends that the alleged Canadian capital flight is a fiction: While the amount of Canadian interest-bearing deposits may have dipped after the reporting requirements were issued, they climbed back up shortly after that. See, e.g., AR 189 (Tabulations of IRS Form 1042s Data, Department of Treasury (2008)); Treasury International Capital Data, Canadian Depositors, Department of

Treasury at 222.  In other words, the existence of such flight all depends on the dates one chooses to compare.  Even if the Court interprets the data in Plaintiffs' favor, however, no evidence on the record shows that the Canadian reporting regulations <u>caused</u> the so-called capital flight that began two years after the regulations took effect, in 2002, and ended around 2003.  In fact, no commenter expressed these concerns about the Canadian data on the record at all. Examining the numbers, the Court cannot say that the IRS's reading of the data is arbitrary or that the prior capital flight (even if it occurred) was so alarming that a lengthy analysis of the Canadian data was required.  The Court, accordingly, finds that the IRS adequately addressed questions regarding capital flight for purposes of the APA.

5. *2001 Proposal*

Finally, the Bankers Associations argue that the IRS ignored the reasons that its 2001 proposal – which would have imposed similar reporting requirements – was withdrawn.  Again, though, this is not true.  The IRS explained in its preamble why these regulations were necessary now, while they may not have been in 2001.  In the interim, the United States "has constructed an expansive network of international agreements, including income tax or other conventions and bilateral agreements relating to the exchange of tax information."  77 Fed. Reg. at 23,391. As a result, the reporting regulations have become "essential."  <u>Id.</u>  Also, unlike the 2001 proposal, the new regulations are not "overly broad" – they do not cover all non-residents, but rather are tailored to cover only residents of countries with which we have an exchange treaty. 67 Fed. Reg. 50,387 (Aug. 2, 2002).  The decision to move forward with a tailored version of the 2001 regulations was thus neither arbitrary nor capricious.

D. RFA

All that remains is the Bankers Associations' contention that the IRS did not comply with the Regulatory Flexibility Act. The RFA requires agencies to either analyze a proposed rule's impact on small businesses or to "certif[y] that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. §§ 603-605(b). Such a certification is reviewed "in accordance with" the APA. 5 U.S.C. § 611(a)(2). In other words, courts are "highly deferential," especially "with regard to an agency's predictive judgments." Helicopter Ass'n Int'l, Inc. v. FAA, 722 F.3d 430, 438 (D.C. Cir. 2013). If an agency makes a "reasonable, good-faith effort to carry out RFA's mandate," then its decision will stand. United Cellular Corp. v. FCC, 254 F.3d 78, 88 (D.C. Cir. 2001) (citation and alterations omitted).

Here, the IRS certified that the regulations would not have a significant economic impact on a substantial number of small entities. While the Service conceded that the rule would affect many small businesses, it determined that the new reporting requirements would not have a "significant" effect on them. See 77 Fed. Reg. at 23,394. The IRS explained that, "[u]nder existing law, all U.S. financial institutions have responsibilities to withhold on and report with respect to depositors who are U.S. citizens, U.S. resident individuals, and Canadian resident individuals, and have developed the systems to perform such withholding and reporting." Id. Those same systems may be used to comply with the new requirements. Specifically, banks already collect Form W-8 from non-resident accountholders, which identifies their country of origin. See id. All banks have systems to process Form 1099-INT, which reports interest earned by U.S. accountholders, and nearly all have systems to process Form 1042-S for Canadian accountholders. See id. "The amount of time required to complete the Form 1042 and Form

1042-S," moreover, "is minimal, and the statement that is required to be collected is brief." Id. The rule thus would not create a significant economic impact.

The Bankers Associations raise three objections. First, they claim that there is no evidence on the record to support the notion that banks have systems in place to report on earned income. Because reporting requirements for U.S. and Canadian residents have been on the books for years, however, it was reasonable for the IRS to conclude that banks do have systems in place that allow them to comply with those requirements – especially since many are required to file their forms electronically. See, e.g., 12 C.F.R. §§ 205.2(e), 205.3(a); 26 C.F.R. §§ 1.141-1, 301.6011-2.

Second, Plaintiffs complain that the IRS failed to take capital flight into account. To begin with, it is not even clear that capital flight is the sort of impact the IRS is required to analyze under the RFA. In general, the RFA calls for agencies to scrutinize only the regulations' direct impact, such as "reporting, recordkeeping and other compliance requirements" – not indirect impacts caused by the actions of third parties like capital flight. 5 U.S.C. § 604(a)(5); cf. also Mid-Tex Electric Cooperative, Inc. v. FERC, 773 F.2d 327, 342 (D.C. Cir. 1984) (RFA requires analysis of the direct impact of rules on regulated parties). In any event, as the Court has just explained, the Service did address concerns regarding capital flight and found the risk to be minimal. As such, further analysis of capital flight was not required.

Third, the Bankers Associations argue that the IRS overestimated the number of banks affected. Of course, the IRS's decision did not rest on the number of banks implicated, which it acknowledged was substantial. Even if the IRS were wrong, though, a smaller number of banks affected would only bolster the conclusion that an RFA analysis was not required here. The 2012 reporting requirements therefore complied with the RFA.

**IV. Conclusion**

Because the interest-reporting regulations violate neither the APA nor the RFA, the Court will grant Defendants' Cross-Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment. A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: January 13, 2014